**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|                                    |   |                    |
|------------------------------------|---|--------------------|
|                                    | : |                    |
| UNITED STATES OF AMERICA           | : | No. 23-cr-63-RDM   |
|                                    | : |                    |
| v.                                 | : |                    |
|                                    | : |                    |
| ENIS JEVRIC,                       | : |                    |
|                                    | : |                    |
| *Defendant.*                       | : |                    |
|                                    | : |                    |

---

### DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

On August 29, 2024, this Court sentenced Metropolitan Police Department ("MPD") Sergeant Enis Jevric to five years of incarceration at a Federal Bureau of Prisons ("BOP") facility. Since November 26, 2024, Sgt. Jevric has been incarcerated at the Federal Medical Center located in Devens, Massachusetts with a current release date of February 27, 2029.

As discussed below, Sgt. Jevric seeks compassionate release. He poses no danger to the community as was the case at the time of his sentencing. Prior to responding to an armed and intoxicated individual who was unresponsive in a running vehicle on a public thruway, Sgt. Jevric had no prior sustained finding of excessive force in his fourteen years of service as an MPD officer. As exemplified by both the written letters of support and the numerous officers and civilians who attended his sentencing, Sgt. Jevric was a humble public servant who made significant contributions to his community after immigrating to the United States to flee ethnic genocide. At the time of his sentencing, he was (and still is) suffering from an irrevocable and debilitating cognitive impairment known as frontotemporal dementia ("FTD"). As foretold at his sentencing, his condition has worsened while in BOP custody.

As set forth in the accompanying letter of Dr. Peter Bernad, a leading expert on

degenerative neurological diseases, the average life span from the time of diagnosis of FTD to death is five to seven years depending on the type of FTD, the patient's living conditions, and his overall health and comorbidities. In Dr. Bernad's medical opinion, Sgt. Jevric is declining both physically and mentally and if he remains in the current prison environment, his condition will steadily worsen and he will be bed-ridden until his death, which may come before his current release date.

Having already exhausted his required administrative remedies, Sgt. Jevric respectfully requests compassionate release from this Court.

## FACTUAL BACKGROUND

### A.    Offense Conduct.

On August 25, 2021, at approximately 2:45 am, Sgt. Jevric, and a dozen other MPD officers, were dispatched to the traffic light at the intersection of New York and Florida Avenues in Northeast, Washington, D.C. At approximately 2:47 am, radio dispatch confirmed the report of a man "passed out" in a Black BMW. More specifically, present at the location, in the thruway, was an unresponsive male driver operating a 2008 BMW 535 Xi bearing Maryland license plate 1ET4183, which was registered to a female. The vehicle's engine was running and the brake lights were illuminated. A firearm was visible in the driver's waistband. The driver was later identified as twenty-seven-year-old An'Twan Gilmore.

At the time officers responded, separate and apart from the driver's unresponsiveness while operating a vehicle in a public thruway with the engine running, the driver was in violation of District of Columbia regulations for the transportation of firearms which cannot be carried on the person nor in a vehicle. Other pertinent questions included: whether the firearm was registered, whether the driver had a license to possess a firearm at home or place of business, whether the

2

driver was otherwise prohibited from being in possession of a firearm, and what the driver was intending to do with the firearm while potentially intoxicated and/or under the influence of narcotics.

Considering the dangers of an incapacitated individual in physical possession of a firearm in a running vehicle, with significant window tint at the intersection of a thruway, MPD was required to ensure the safety of other drivers and pedestrians. Officers were also required to investigate the status of Mr. Gilmore, *one*, to see if he was physically stable, and *two*, to ensure that he was not prohibited from being in possession of a firearm (a dangerous offense) and was not using the firearm for unlawful purposes (such as, to commit a violent crime, for instance, as a robbery or assault).

It would later be determined that the firearm was loaded and it had *originated* from South Carolina. Mr. Gilmore also had an active arrest warrant for Assault with a Dangerous Weapon (Firearm) and that he had previously been convicted of a felony crime of violence which made it unlawful for him to be in possession of a firearm on the morning in question or in the event leading to the pending arrest warrant. *See* Presentence Report ("PSR"), ¶ 153 (D.E. 40) (detailing relevant history), *see also* https://wjla.com/news/local/dc-police-body-camera-footage-released-shooting-death-27-year-old-antwan-gilmore, last visited July 14, 2025.[1]

At approximately 2:55 am, radio dispatch confirmed additional units had already responded. At 2:57 am, a request for a shield was dispatched. At 2:59 am, dispatch reported to all officers that the driver of the vehicle had a gun in his waistband. Officers closed the entire block

---

[1] The inherent danger posed by this situation is exemplified by Mr. Gilmore, who at the time of the event, had 34 prior arrests by the age of 27, was a multiple convicted felon, was the subject of a pending crime of violence warrant, and was an MPD validated gang member of the 1st and O Gang.

from pedestrian and vehicle traffic given the inherent danger to all those present. Reports of shots fired at 3:08 am were noted by dispatch. Prior to Mr. Gilmore trying to operate the vehicle to leave the scene and shots being fired, officers knocked on the window of the vehicle, used flashlights, tried the doors, and made every possible attempt to get Mr. Gilmore's attention while he was armed and passed out in the running vehicle.

A presumably intoxicated person in possession of a firearm, operating a vehicle in the public thruway creates a dangerous situation not only for the driver, but also for any citizens in immediate proximity and all officers involved, as shown by the enclosed photograph of responding officers (to include Sgt. Jevric) with weapons drawn.[2] The inherent danger to all present was heightened when Mr. Gilmore looked at the officers and then proceeded to drive off in the direction of the two police cruisers visible up the block. The yellow arrow points out the officer with the assault rifle and the blue arrow identifies Sgt. Jevric with the shield:

---

[2] During its investigation, the Government learned from law enforcement witnesses that it was uncommon for officers to encounter armed individuals locked inside their vehicles and that they had "no training for a situation such as this," especially with the "tinted windows making the situation even more precarious." Prior to sentencing and a resolution of the civil tort wrongful death action, the Government took extreme efforts to restrict the defense from filing in the public record information learned by the Government in its grand jury investigation, including the source of such information. The Government took this position even though the grand jury investigation expired with the return of an indictment on March 2, 2023 and the secrecy protections afforded to that information were no longer warranted. To avoid unnecessary motion practice, Sgt. Jevric is removing reference to the source of the information referenced in the factual history of this matter as it is already set forth in prior sealed filings in this case.



*See* Gov't Sent. Mem., Ex. 1 (D.E. 31-1).

As explained by fellow officers, Sgt. Jevic volunteered to open himself to danger as the "point person" holding the shield and to take on the most challenging responsibility on scene and "put himself in the position of risk." As shown in the photograph below, the shield was heavily scratched on the visor, impairing Sgt. Jevric's field of view, requiring him to pull down the shield (further exposing himself to gunfire) to gain additional visibility:



*See* Gov't Sent. Mem., Ex 2 (D.E. 31-2). MPD ballistic shields now have lights on them, which

did not exist at the time of the incident.

As shown in BWC video, Sgt. Jevric had a split second to determine what Mr. Gilmore had his right hand (blue arrow) clenched around, while his left hand (yellow arrow) was near the steering wheel, after a gun was previously identified on his person:



GX Ex. CK-2. Sgt. Jevric, believing he saw a firearm, fired his weapon as Mr. Gilmore's vehicle drove toward the police cruisers (identified by the blue arrow below) that Sgt. Jevic believed were occupied by officers who were in danger:



Once the vehicle in question stopped, MPD officers immediately rendered aid to Mr.

Gilmore. At the time of the event, there was no MPD policy in place to deal with locked vehicles with armed individuals inside. Specifically because of this event, MPD issued EO-21-33, which provides guidance to officers for dealing with barricade situations, where a subject is armed, barricaded in, and unresponsive to police commands. The executive order requires the deployment of an Emergency Response Team, akin to a swat level team of MPD officers who are trained in special tactics. *Id.* This policy was not in place until December 30, 2021. *Id.* MPD officer witnesses also confirmed with the Government that at the time of the event, MPD policy prohibited the blocking of vehicles with other police cars and that they had received insufficient training for this type of situation.

As part of the Government's investigation, law enforcement officer communications with Sgt. Jevric were subpoenaed around the time of the shooting. There was no evidence of any obstruction, conspiracy, cover up, or inappropriate comments about the event or Mr. Gilmore. Rather, there was nothing but encouragement and support for Sgt. Jevric in knowing that he was distraught after taking the life of another.

### B. Procedural History.

Over eighteen months after the event, on March 2, 2023, following efforts by Mr. Gilmore's family's civil counsel, the Government indicted Sgt. Jevric on three charges: one count of deprivation of rights under color of law resulting in death, in violation of 18 U.S.C. § 242, one count of using a firearm to commit murder, in violation of 18 U.S.C. §§ 924(c), (j), and one count of second degree murder, in violation of D.C. Code § 22-2103. On February 23, 2024, Sgt. Jevric pled guilty to a two-count Information charging him with one count of deprivation of rights under color of law resulting in death, in violation of 18 U.S.C. § 242, and one count of involuntary manslaughter, in violation of D.C. Code § 22-2105.

On August 29, 2024, this Court sentenced Sgt. Jevric to five years of incarceration to be followed by five years of supervised release.[3] Sgt. Jevric surrendered to the Federal Medical Center ("FMC")-Devens on November 26, 2024 and is currently in custody at that facility. He is scheduled to be released on February 27, 2029. *See* BOP Locator, https://www.bop.gov/mobile/find_inmate/byname.jsp, last visited July 14, 2025. On April 24, 2025, Sgt. Jevric's administrative request for compassionate release was denied by the Warden of FMC-Devens, a copy of which is attached as Exhibit 1.

### C.     Sgt. Jevric's Medical History.

The Metropolitan Police Employee Assistance Program ("MPEAP") is a "counseling program for police officers, police officials, and family members" that has "four full-time, licensed therapists who have historical experience working with law enforcement families." *See* https://www.mpeap.com/about.html, last visited July 14, 2025. MPEAP is a partnership between MPD and its officer members. Officers who have suffered traumatic events are encouraged to seek assistance pursuant to an MPD General Order.

As set forth in the PSR (at ¶ 74), Sgt. Jevric began treatment with Dr. Beverly Anderson, MPEAP's Clinical Director, on July 26, 2022.[4] He presented with symptoms consistent with post-

---

[3] Sgt. Jevric was sentenced to 46 months of incarceration on the federal offense and 60 months of incarceration on the D.C. Code offense, with the sentences to run concurrently. The Court apparently sentenced in this manner to increase Sgt. Jevric's total period of incarceration without engaging in an upward variance on the federal offense, whose guidelines at sentencing were only 37 to 46 months. *See* PSR, ¶¶ 10, 112. Unfortunately, BOP has advised Sgt. Jevric that he is ineligible for any First Step Act ("FSA") reductions to his sentence regardless of what courses he takes while in BOP custody because the FSA does not apply to D.C. Code offenses. Accordingly, Sgt. Jevric is not receiving the same benefits that other similarly situated defendants would receive for similar civil rights offenses. Sgt. Jevric respectfully asks the Court to take this into consideration when evaluating the § 3553 factors as part of its compassionate release analysis.

[4] Dr. Anderson specializes in police and trauma psychology and is a qualified expert in the areas of post-traumatic stress disorder and police trauma. She holds master's degrees in clinical

traumatic stress disorder ("PTSD") and additional vestibular and neurological symptoms related to a complex medical history of chronic cholesteatoma and ear infections. *Id.* Sgt. Jevric's symptoms included hearing loss, dizziness, loss of balance, headaches, brain fog, "zoning out," memory loss, earaches, pressure in the head, timing and space disorientation, neck stiffness, difficulty swallowing, and sharp pain in the frontal and left temporal areas of his head. *Id.* His prior ear nose and throat doctor tried to treat his chronic ear infections, which consisted of two or three infections yearly for eight years.

After multiple failed courses of treatment, in 2015, Sgt. Jevric was referred to Dr. Ashkan Monfared at George Washington University, who specializes in neurological diseases of the ears and the nerves that connect the ears to the brain. *Id.* Sgt. Jevric was diagnosed with severe cholesteatoma, which are growths that can develop in the middle ear or mastoid bone, often behind the eardrum. *Id.* at ¶¶ 74-78; *See* Opinion Letter of Dr. Peter Bernad dated June 11, 2025 ("Bernad Opp'n") at 1-2, attached hereto as Exhibit 2. Dr. Monfared scheduled surgical procedures to remove the invasive growths that had severely damaged the ear and mastoid regions. *Id.* Sgt. Jevric had a tympanal mastoidectomy with ossicular chain reconstruction using 2mm and numerous additional procedures. PSR, ¶¶ 74-78; Ex. 2 at 1-2. The disease was so advanced that additional surgeries were performed in 2016 and 2017. PSR, ¶¶ 74-78. Sgt. Jevric has been left immunocompromised because his inner ear is "open" and unprotected, thus presenting an

---

psychology and counselor education, and PhDs in counseling psychology and clinical psychology. Dr. Anderson completed a residency at Walter Reed Army Medical Center focusing on treating PTSD. *See* https://www.mpeap.com/anderson.html, last visited July 14, 2025. Dr. Anderson prepared a report regarding Sgt. Jevric for United States Probation on May 28, 2024 (PSR, ¶ 57) and a copy was filed under seal with the Court on August 1, 2024. In preparing her evaluation, Dr. Anderson relied on medical records provided to her by Sgt. Jevric's treating physicians, certain of which were directly incorporated into her written report.

increased risk of infection. *Id.* As a result, Sgt. Jevric required treatment by Dr. Monfared every four months. *Id.* If left untreated, serious complications could result to Sgt. Jevric, including brain abscess, sepsis, and even death. PSR, ¶¶ 74-75.

Dr. Anderson also referred Sgt. Jevric to neurologist Dr. Peter Bernad,[5] who conducted an initial assessment on March 8, 2024. *Id.* ¶ 75; Ex. 2 at 1-2. As part of his evaluation of Sgt. Jevric, Dr. Bernad ordered numerous diagnostic tests, to include: a CT internal auditory canal ("IAC") w/o contrast, electroencephalogram ("EEG"), positron emission tomography ("PET"), computed tomography ("CT") of the brain, carotid ultrasound, electronystagmography ("ENG"), and a neurocognitive assessment (Creyos Brain Sciences). *Id.* at 2. The Creyos neurocognitive assessment (formerly Cambridge Brain Sciences) was administered and scored at Neurology Services, Inc. This neurocognitive assessment has demonstrated reliability and validity scales and it is computer generated and scored thereby reducing administration bias effect. *Id.*

The Creyos findings were as follows:

**Memory Deficits:**

1) Visuospatial Working Memory. Sgt. Jevric scored well below average at the 14th percentile, which is implicated in dementia, attention-deficit/hyperactivity disorder ("ADHD"), stroke, and concussion diagnoses.

2) Episodic Memory: Sgt. Jevric scored well below average at the 14th percentile, which is implicated in FTD diagnoses.

---

[5] Dr. Peter Bernad's curriculum vitae is already part of the Court's record. *See* D.E. 51-2. Dr. Bernad is a neurologist in the Washington, DC metropolitan region and has been affiliated with multiple hospitals, to include, George Washington University Hospital and Inova Fairfax Hospital. He received his medical degree from McGill University and specializes in neurology. He has been published in dozens of journals and has written two books on neurological topics. *Id.*

**Reasoning Deficits:**

1) Visuospatial Processing. Sgt. Jevric scored well below the average at the 15th percentile, which is implicated in dementia, Parkinson's disease, and concussion diagnoses.

**Concentration Deficits:**

1) Response Inhibition: Sgt. Jevric scored well below average at the 2nd percentile, which is implicated in dementia, epilepsy, Parkinson's disease, ADHD, PTSD, concussion, frontal lobe disorders, depression, and Huntington's disease.

*Id.* at 2.

These findings, in concert with Sgt. Jevric's past medical history led Dr. Bernad to a "confirmation of FTD." *Id.* at 2-3. Specifically, Sgt. Jevric's many years of Chronic Otis Media (untreated ear infections), followed by the diagnosis of severe cholesteatoma and its chronic and destructive course requiring three surgeries further contributed to the diagnosis of FTD. *Id.* at 3. Moreover, Sgt. Jevric's physical exam, neurological review of systems, and neurocognitive testing all supported the FTD diagnosis. *Id.*

FTD is a term used to describe a group of brain diseases that affect the nerve cells in the frontal and temporal lobes. *Id.* These areas of the brain are associated with behavior, personality, and language. There are no available treatments and no known cure for FTD. *Id.* Its cause has been associated with infections, trauma, and in some cases, genetic inheritance. FTD tends to present at a younger age than other forms of dementia with symptoms first appearing between the ages of 40 and 65. *Id.* Symptoms progress in severity with age. FTD is sometimes misdiagnosed as clinical depression. *Id.*

Dr. Bernad's opinion letter also includes a review of Sgt. Jevric's BOP medical records. *Id.* at 4-6. For example, a November 27, 2024 intake note states that Sgt. Jevric arrived with "0"

medical records. In turn, the medical staff, by their own admission, had no knowledge of Sgt. Jevric's complex medical history and his diagnosis of FTD, severe and chronic cholesteatoma, hearing impairment, PTSD, anxiety, and depression. *Id.* at 4. As such, Sgt. Jevric's records establish that BOP is not providing adequate medical treatment for his condition. *Id.* at 4-5.

According to his BOP records, on January 7, 2025, Sgt. Jevric "hit the duress alarm and stated that he needed suicide watch." He reported having nightmares, significant weight loss, and depression. He reported that he felt like he was "losing his mind" in the specialized housing unit ("SHU") where he was residing, reporting that he had not seen the light of day in five weeks thus contributing to his severe anxiety. Moreover, A. Hoyt, MA, a psychology doctoral intern, reported that Sgt. Jevric feared for his safety.

On April 9, 2025, Erica Fasano, MD noted that Sgt. Jevric had a history of Traumatic Brain Injury ("TBI"), concussions, PTSD, and brain infection which contribute to his worsening mood. Although Dr. Fasano mentions that Sgt. Jevric had an infection that spread to his brain, she made no mention of the diagnosis, supporting imaging data reports, or neurocognitive metrics performed. Dr. Monfared, Sgt. Jevric's surgeon, directed that he receive ongoing care every four months for treatment of the cholesteatoma and that he apply mineral oil to keep the ear lubricated. *Id.* at 5. As of April 9, 2025, Dr. Fasano stated that Sgt. Jevric "still hasn't gotten mineral oil." Dr. Monfared indicated that Sgt. Jevric is immunocompromised due to the inner ear being "open" and unprotected, which presents an infection risk. *Id.* at 4. Without treatment, serious complications could occur, such as, brain abscess, infection, sepsis and death. *Id.* at 5. According to the medical notes, Sgt. Jevric has not received adequate care for the cholesteatoma. *Id.*

BOP medical records also do not mention the PET scan that confirmed the diagnosis of FTD or the cognitive testing administered that demonstrated the severe cognitive deficits that Sgt.

Jevric suffers from as a direct result of FTD. All this information, in addition to facts regarding Sgt. Jevric's hearing loss and multiple surgeries to repair the damage caused by the cholesteatoma, are absent from his BOP medical record notes.

Based on a review of the BOP medical records, Sgt. Jevric has not even received palliative care. Moreover, the prison personnel have no knowledge of his serious medical conditions. Sgt. Jevric has deteriorated considerably and this decline has been noted by those who have visited him. A former MPD colleague described a very foul odor emanating from his breath and a sense of hopelessness as he is not receiving adequate medical treatment:

> On May 5, 2025, I personally visited Jevric at the Federal Bureau of Prisons Medical Center, located in Devens, Massachusetts where Jevric is housed pursuant to his sentence. I had the opportunity to speak with him and view his appearance during our meeting. Jevric's beard was long and not trimmed and it almost appeared dirty. He appeared very unkempt and had a foul and very strong odor emanating from his breath. He appeared depressed, abandoned, and without hope. He complained to me about the lack of medical treatment that he is receiving. He expressed that he is in constant pain with burning inside his ear and on his scalp and advised me he has repeatedly asked for mineral oil to treat it, but his requests have been denied. He also told me that he has repeatedly asked to see a doctor about his condition, but nothing has happened.

*See* Declaration of Andrew Zabavsky dated June 12, 2025 ("Zabavsky Decl."), ¶¶ 2-3, attached hereto as Exhibit 3. Consistent with MPD Lieutenant Zabavsky's observations (*id.*), Dr. Bernad noted that "[c]holesteatoma can be accompanied by a foul-smelling drainage into the eustachian tube into the throat." Ex. 2 at 6. Given such a finding, Dr. Bernad concluded that "Sgt. Jevric needs further medical care and treatment to rule out additional infectious processes which could be life-threatening." *Id.*

As previously referenced, it is in Dr. Bernad's medical opinion that Sgt. Jevric's "condition will worsen steadily and more quickly, and he will be bed-ridden until his death which may come before his release in five years." *Id.* at 6.

## ARGUMENT

Compassionate release is not a new remedy; in fact, "[i]t dates back at least to the Parole Reorganization Act of 1976." *United States v. Shkambi*, 993 F.3d 388, 390 (5th Cir. 2021). This early compassionate release statute read as follows: "[a]t any time upon motion of the Bureau of Prisons, the court may reduce any minimum term to the time the defendant has served." 18 U.S.C. § 4205(g) (repealed 1987). "The capaciousness of that text authorized the BOP to request (and district courts to grant) reductions for a wide range of reasons." *Shkambi*, 993 F.3d at 390.

In 1984, Congress enacted the Sentencing Reform Act ("SRA") wherein "Congress abolished federal parole and forbade the federal courts from 'modifying a term of imprisonment once it has been imposed.'" *Id.* (citation omitted). But Congress retained an exception for compassionate release motions through its enactment of 18 U.S.C. § 3582. *Id.* Thus, even after the SRA, a district court could, on a motion from the BOP, modify a term of imprisonment where, inter alia, "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). In enacting § 3582, Congress intended it to act as a "'safety valve[]' for modification of sentences" to "assure the availability of specific review and reduction of a term of imprisonment for 'extraordinary and compelling reasons.'" S. Rep. No. 98-225, at 121 (1983). Through § 3582, Congress intended to keep "the sentencing power in the judiciary where it belongs, yet permit[] later review of sentences in particularly compelling situations." *Id.* "This legislative history demonstrates that Congress, in passing the Comprehensive Crime Control Act of 1984, intended to give district courts an equitable power to employ on an individualized basis to correct sentences when 'extraordinary and compelling reasons' indicate that the sentence initially imposed on an individual no longer served legislative objectives." *United States v. Millan*, No. 91-cr-685 (LAP), 2020 WL 1674058, at *5 (S.D.N.Y. Apr. 6, 2020).

"Federal law has long authorized courts to reduce sentences of federal prisoners facing extraordinary health conditions," but prior to the passage of the First Step Act of 2018, district courts could grant such reductions only upon a motion by the Director of Bureau of Prisons under 18 U.S.C. § 3582(c)(1). *See United States v. Beck*, No. 1:13-cr-186-6, 2019 WL 2716505, at *4 (M.D.N.C. Jun. 28, 2019). However, Congress amended § 3582(c)(1) when it passed the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194. Pertinent here, the First Step Act added a provision to § 3582(c)(1) that allows a defendant to bring a motion for compassionate release directly in a district court after either "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

Under 18 U.S.C. § 3582(c)(1)(A) and the corresponding policy statement USSG §1B1.13, a court is authorized to grant a reduction in sentence if three requirements are met. *First*, the offender must exhaust administrative remedies by submitting a request to the warden of the offender's facility. 18 U.S.C. § 3582(c)(1)(A). *Second*, the offender must demonstrate "extraordinary and compelling reasons" for a sentence reduction. *Id. Third*, the court must find that relief is warranted under the § 3553(a) sentencing factors. *Id.* The statute also provides that a reduction must be consistent with "applicable policy statements issued by the Sentencing Commission." *Id.*; *see* United States Sentencing Guidelines ("USSG") § 1B1.13(a) (2024).

"Accordingly, to grant a motion for compassionate release, a court must now, in addition to finding that the other elements of the compassionate release standard are satisfied, also find that granting such relief 'is consistent with' Policy Statement 1B1.13, which sets forth the circumstances under which an extraordinary and compelling reason for compassionate release or

sentence reduction would exist." *See United States v. Feliz*, No. 16-cr-809, 2023 WL 8275897, at

*4 (S.D.N.Y. Nov. 30, 2023) (citing 18 U.S.C. § 3582(c)(1)(A) and USSG 1B1.13 Policy

Statement (U.S. Sent'g Comm'n 2023) (amended Nov. 1, 2023) (additional internal citations

omitted)). Pursuant to the 2023 Amendments, the Sentencing Guidelines now identify six

instructive categories of extraordinary and compelling reasons that may allow for a sentence

reduction. *See* Appendix A, USSG § 1B1.13(b) (2023).

The policy statement specifies the types of medical conditions that qualify as

"extraordinary and compelling reasons." *First*, that standard is met if the defendant is "suffering

from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis

(ALS), end-stage organ disease, [or] *advanced dementia*." USSG § 1B1.13(b)(1)(A) (emphasis

added). *Second*, the standard is met if the defendant is:

> (i) suffering from a serious physical or medical condition,
> (ii) suffering from a serious functional or cognitive impairment, or
> (iii) experiencing deteriorating physical or mental health because of the aging process, that
> substantially diminishes the ability of the defendant to provide selfcare within the
> environment of a correctional facility and from which he or she is not expected to recover.

*Id.* at § 1B1.13(b)(1)(B)(i)-(iii). *Third*, the standard is met if the defendant is "suffering from a

medical condition that requires long-term or specialized medical care that is not being provided

and without which the defendant is at risk of serious deterioration in health or death." *Id.* at §

1B1.13(b)(1)(C).

Notwithstanding these Guideline provisions, "[w]hen Congress authorized district courts,

as a matter of discretion, to release an inmate from prison based on extraordinary and compelling

reasons, it did so to introduce compassion as a factor in assessing ongoing terms of imprisonment,

authorizing a district court to give greater weight to an inmate's personal circumstances—when

sufficiently extraordinary and compelling—than to society's interests in the defendant's continued

incarceration and the finality of judgments." *See United States v. Hargrove*, 30 F.4th 189, 197 (4th Cir. 2022). Moreover, the Guidelines, while helpful, are merely advisory and do not bind the Court. *See McCoy*, 981 F.3d at 284. "[D]istrict courts are 'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise'" *Id.* (quoting *United States v. Zullo*, 976 F.3d 228, 230 (2d Cir. 2020)). Accordingly, if this Court believes that compassionate release is appropriate for Sgt. Jevric based on extraordinary and compelling reasons, it is empowered to release him.

## I.    Sgt. Jevric is Not a Danger to the Community.

As a preliminary matter, Enis Jevric is far from any danger to the community. He was sentenced by this Court for his first ever criminal offense after honorably serving the District of Columbia as a law enforcement officer and putting his life on the line in defense of the United States Capitol on January 6, 2021. At sentencing, the Government conceded that there was absolutely no history of any sustained findings of excessive force in Sgt. Jevric's fourteen years of service. Numerous letters of support were submitted on his behalf at sentencing and numerous law enforcement officers and members of three separate faith communities attended his sentencing given the contributions that he has made to his community.

## II.   Sgt. Jevric is Suffering from an Irrevocable Debilitating Cognitive Impairment That Cannot Be Adequately Treated at a BOP Facility.

As discussed above, Sgt. Jevric was diagnosed with FTD, which is supported by Sgt. Jevric's physical exam, neurological review of systems, multiple imaging modalities, and neurocognitive testing. Ex. 2 at 6. This likely resulted from Sgt. Jevric's many years of Chronic Otis Media (untreated ear infections), followed by the diagnosis of severe cholesteatoma and its chronic and destructive course requiring three separate surgeries. *Id.* at 3. Sgt. Jevric is not receiving the necessary medical treatment for his cholesteatoma and FTD and is incurring

significant pain and mental anguish. Given Sgt. Jevric's current living conditions and insufficient medical care, his FTD symptoms are only worsening, which is further diminishing his life expectancy. *Id.* at 6.

In *United States v. York*, the defendant obtained compassionate release under the medical-condition provision for compassionate release due to his chronic systolic heart failure. No. 3:11-cr-76, 2019 WL 3241166, at *6 (E.D. Tenn. July 18, 2019). Despite the Government's counterarguments, the district court found that extraordinary circumstances given there were numerous occasions where the defendant had chest pain and difficulty breathing. *Id.* at *3. Even worse, he suffered at least one heart attack while in BOP custody. *Id.* The court held that the defendant's medical conditions fell under the medical-circumstance provision as a serious and advanced illness with an end-of-life trajectory warranting compassionate release. *Id* at *6.

In *United States v. Leggitt*, the district court granted the defendant's motion for compassionate release after the defendant demonstrated symptoms arising from his laryngeal cancer diagnosis. No. 4:12-cr-00306-06, D.E. 916 at 3-4 (E.D. Ark. May 6, 2019). Communicating through an artificial larynx in his throat, the defendant's symptoms included sensitivity at the site, a burning throat, bloody secretions, difficulty swallowing, and weight loss. *Id.* Because of this, the district court found that the defendant suffered from a "serious physical or medical condition"— namely, laryngeal cancer and the symptoms associated with that cancer and the treatment of the same—that substantially diminishe[d] his ability to provide self-care within the environment of a correctional facility and from which he is not expected to recover." *Id.* Accordingly, after considering the record evidence and the factors set forth in 18 U.S.C. § 3553(a), the court found that the defendant demonstrated the existence of "extraordinary and compelling reasons" that rendered him eligible for compassionate release. *Id.* at 4.

As in *York*, Sgt. Jevric has an end-of-life trajectory given his FTD diagnosis and BOP's inability to treat his medical needs, which has facilitated a continued physical and mental decline. Moreover, as in *Leggitt*, Sgt. Jevric's medical condition and current lack of treatment substantially diminishes his ability to provide self-care within the environment of a correctional facility and from which he is not expected to recover.

In this case, there are multiple grounds within the Guidelines and outside the Guidelines consistent with this Court's discretion to find an extraordinary and compelling reason to grant compassionate release. *First*, Sgt. Jevric is suffering from a "terminal illness," where "advanced dementia" is expressly identified as an example of a terminal illness. USSG § 1B1.13(b)(1)(A). *Second*, Sgt. Jevric is suffering from a "serious physical or medical condition" (*id.* at 1B1.13(b)(1)(B)(i)) and a "serious functional or cognitive impairment" (*id.* at 1B1.13(b)(1)(B)(ii)). *Third*, as set forth above, and for which courts have relied upon for granting compassionate release motions, Sgt. Jevric is suffering "from a medical condition" that "requires long-term or specialized medical care that is not being provided and without which [he] is at risk of serious deterioration in health or death." *Id.* at 1B1.13(b)(1)(C).[6]

---

[6] *See*, *e.g., United States v. English*, No. 19-cr-20164, 2022 WL 17853361, at *8 (E.D. Mich. Dec. 22, 2022) ("In sum, BOP's gross mismanagement of English's serious health conditions, even if they are not yet life-threatening, presents an extraordinary and compelling reasons for release."); *United States v. Gaulden*, No. 499-cr-001-2, 2022 WL 2820114, at *34 (S.D. Ga. July 19, 2022) (granting release as a result of the defendant's seizure disorder and comorbid conditions); *United States v. Kohler*, No. 8:15-cr-425, 2022 WL 780951, at *4 (M.D. Fla. Mar. 15, 2022) (granting compassionate release based on prison's failure to adequately treat defendant's heart condition and other serious medical issues); *United States v. Perez-Urena*, No. 1:05-cr-477-MHC-GGB-2, slip op. at 2-3, 24 (N.D. Ga. Oct. 26, 2021) (granting release in part due to the fact that the defendant was not receiving needed medical care for his diabetes and related medical conditions); *United States v. Munera-Cadavid*, 89-cr-00294, slip op. at 3-5 (S.D. Fla. Aug. 8, 2021) (granting compassionate release due to high risk of aggressive skin cancer and failure to receive sufficient preventative care); *United States v. Eubanks*, No. 3:06-cr-105, 2021 WL 3557653, at *4 (W.D. Ky. Aug. 11, 2021) (finding defendant's serious medical condition and difficulty of providing care to justify compassionate release); *United States v. Oshinski*, No. 2:14-cr-00284, 2021 WL

For all these reasons, Sgt. Jevric meets the standard for compassionate relief.

## III.    The Section 3553(a) Factors Support Compassionate Release.

At the time of sentencing, the 3553(a) factors supported the most lenient sentence possible under the circumstances.[7] The history and characteristics of Sgt. Jevric reflected a fourteen-year public servant who spent the better part of his life helping people, not hurting people, protecting lives, not taking them. He personified the American dream by immigrating to this country to flee religious persecution and worked his way from poverty, through college, to the police force. He joined the Metropolitan Police Department ("MPD") in April 2007 and rose to the rank of sergeant in 2014, spending over a decade on patrol and supervising other patrol officers. Sgt. Jevric responded to numerous calls for assistance while subjecting himself to violence, firearms, and trauma, all to the detriment of his own mental and physical health. Sgt. Jevric was a well-respected law enforcement officer and served for fourteen years without a single sustained finding of

---

2518981, at *2 (D. Nev. Jun. 17, 2021) (finding defendant's current medical condition and the inability of the prison to treat it qualifies for compassionate release under USSG §1B1.13); *United States v. Morse*, No. 10-cr-20361, 2020 WL 6534899, at *3 (S.D. Fla. Nov. 3, 2020) (granting release in part because the defendant was "not currently receiving necessary medical follow up and treatment for his ongoing health issues while incarcerated."); *United States v. Vazquez Torres*, No. 19-cr-20342, at *4 (S.D. Fla. Jul. 14, 2020) (granting compassionate release given the defendant's "current health issues and the obstacles he faces in receiving adequate and complete treatment while incarcerated").

[7] Pursuant to 18 U.S.C. § 3553(a), the Court is required to "impose a sentence sufficient, but not greater than necessary," to comply with the purposes of sentencing, specifically, "(2) the need for the sentence imposed— (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." The Court is also required to consider the additional sentencing factors of "the nature and circumstances of the offense and the history and characteristics of the defendant;" "the kinds of sentence and the sentencing range established" for the offense; "any pertinent policy statement— issued by the Sentencing Commission; "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;" and "the need to provide restitution to any victims of the offense."

excessive force prior to the event at issue. He defended the U.S. Capitol at its darkest hour and assisted numerous citizens throughout his career, some recognized by MPD and some only known to Sgt. Jevric himself. He received a Life Saving Medal for his actions in saving the life of a D.C. resident who was suicidal. Throughout the investigation of this case and in the letters attached to his sentencing memorandum, fellow officers and supervisors spoke of Sgt. Jevric's kindness, work ethic, his strong character, and attested to the fact that he is someone who does not exhibit malice towards anyone.

As for just punishment and recognition of the seriousness of the conduct, the Government chose to criminally prosecute an officer who responded to an armed and intoxicated driver in the middle of the street with the engine running. As discussed above, over a dozen officers from various backgrounds and races spent significant time trying to defuse the situation by knocking on the windows, using their flashlights to illuminate the vehicle, trying to open the locked doors, and otherwise giving the driver every opportunity to awaken and comply with law enforcement's request to stop and exit the vehicle.[8] Given this extremely dangerous situation, almost every officer on scene, including Sgt. Jevric, had their firearms pointed and at the ready, including an officer with an assault rifle, to be used if the driver were to fire against the officers surrounding the vehicle. This was not an overreaction, but the reality of what officers face day in and day out in the Nation's

---

[8] The race of the parties played no role in the events at issue in this case. The Court had previously expressed on the record that this was an important factor when it sentenced Metro Transit Police Officer Andra Vance to one year and one day of incarceration (No. 19-cr-251-RDM (D.D.C.)). In that case, Officer Vance sent an unarmed arrestee to the hospital after multiple strikes from his baton and when the baton was pressed against the arrestee when he was in a pool of blood on the ground. In the present case, this Court stated that it would have given Sgt. Jevric an even higher sentence if he had a prior sustained finding of excessive force. In *Vance*, while the Government noted two prior sustained findings of excessive force, the Court departed and varied downward from a guidelines range of 108 to 135 months to one year and one day. At present, Sgt. Jevric has already served more time than Officer Vance served prior to his release from BOP custody.

Capital, with the proliferation of guns and shootings. Then, in a split second, the driver moved forward — ultimately heading toward police cruisers that Sgt. Jevric believed were occupied by law enforcement officers. Sgt. Jevric, looking through the vehicle's tinted windows, saw the driver's hand raise up and grab something, and believing it was a gun, made the decision to discharge his firearm.

While the loss of any life in society is tragic, Sgt. Jevric did not wake up on that day intending to abuse his police power, to hurt or injure anyone, or to send a message, nor were his actions a product of racism or hatred, contrary to certain outrageous generalizations at his sentencing. Instead, he simply wanted to protect his community and his fellow officers. As discussed above, all MPD fact witnesses attested that there was no perfect strategy to resolve this dangerous situation. In fact, it is undisputed that following the incident, MPD adopted a new policy to deal with armed individuals barricaded inside vehicles that was in effect at the time of the incident.

Moreover, it was learned after his sentencing and not during discovery that Sgt. Jevric previously arrested Mr. Gilmore years earlier when Mr. Gilmore was under the influence of drugs and in possession of an air rifle. In that case, rather than acting recklessly or 'trigger happy" (as the Government alluded to in this case), Sgt. Jevric gave multiple verbal commands to Mr. Gilmore to drop his weapon and was able to talk him down without using any force, let alone, justified deadly force.[9] That event correlates to the criminal history of Mr. Gilmore, who was arrested on March 8, 2029 for unlawful possession of a BB gun. Sgt. Jevric's narrative from that case reflects:

> The offense occurred on 3/08/09 at approximately 1915 hours at 1515 Islamic Way, NW in Washington, D.C.  I, OFC JEVRIC, E (Unit 3031) in a marked scout car and in full uniform answered up for a radio run for a man with a rifle on New Jersey

---

[9] The current deadline for a § 2255 motion based on this new evidence is August 28, 2025.

avenue and R St, NW. The lookout was for a black male on a bicycle with a white t-shirt and carrying the rifle. I canvassed the area and located R1 in the 1600 Block of Islamic Way, NW. I ordered R1 to drop the rifle on several occasions and after pleading with him, he eventually dropped it in front of the listed location (1515 Islamic Way, NW) without any incident or injury to R1. Afterwards it was determined that the weapon was an air rifle. R1 was placed under arrest and transported to Juvenile Processing. There they refused R1 because he admitted to using drugs. R1 was then transported to Childrens Hospital by the arresting officer.

Respect for the law was established by Sgt. Jevric's prosecution for a split-second decision. He went from a highly respected and decorated police officer to a convicted felon incarcerated in a BOP facility for involuntary manslaughter, *i.e.*, reckless, not intentional conduct. In this case, Mr. Gilmore's family settled a wrongful death case, thereby removing any need for restitution. There is also zero need to protect the community as Sgt. Jevric will never be a law enforcement officer again and will not face the difficult task he volunteered for as the point person during the incident at issue. No one can diminish the terrible loss of life that occurred in this case. That result is significant and tragic, while the circumstances that led to that outcome are complex. Notably, in this case, Sgt. Jevric did not intend to unlawfully take the life of another person and he and his fellow officers made numerous attempts to avoid any injury to Mr. Gilmore and to themselves.[10]

Most relevant, Sgt. Jevric suffers from FTD and PTSD. He is in pain and mental anguish because he is not receiving necessary medical treatment for a condition that has a limited life expectancy. Regardless of his serious medical conditions that are directly relevant to his sentencing under the statutory sentencing factors, the media coverage in this case and the protests that followed (fueled in large part by the media omitting that Mr. Gilmore had a firearm on his person

---

[10] As undersigned counsel stated at the sentencing hearing, regardless of how the Government actually charged this case, this matter was never a murder case and should, at worst, have been charged as involuntary manslaughter. Accordingly, Sgt. Jevric received little consideration for his entry of a guilty plea in this case, especially when the Government allocuted for a top of the guidelines sentence for a first-time offender.

at the time of the incident and instead alleging that he was shot when he was sleeping or just driving home) led to outrage against Sgt. Jevric and claims that *the streets* would take care of him for his actions. Photographs of public protests against Sgt. Jevric are depicted below:



Sgt. Jevric will always be judged by the events of August 25, 2021. It will remain with him for the rest of his life. This enormous pressure and challenges, nonetheless, mitigate against a lengthy continued period of incarceration in this case. *See*, *e.g.*, *Graham v. Connor*, 490 U.S. 386, 396-97 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, and its calculus must embody an allowance for the fact that police officers are often forced to make split-second decisions about the amount of force necessary in a particular situation.").

In the scale of civil rights prosecutions in this country, from the beating of Rodney King to the murder of George Floyd, the nature and circumstances of this case are more aligned with cases where the Department of Justice declined prosecutions, instead relying on traditional remedies of administrative punishment, civil liability, and consent decrees for more training of officers (as was previously done with MPD years earlier).

The statutory factors do not justify Sgt. Jevric remaining in a BOP facility that will continue his downward declining medical condition that will ultimately lead to his death. *See* Ex. 2 at 5-6.[11]

---

[11] Sgt. Jevric has the unwavering support of his family, friends, and religious community. If the Court grants compassionate release, Sgt. Jevric can reside in Maryland or Virginia. He also has family in New York that are willing to live with him upon his release if the Court has any concerns

## CONCLUSION

For the foregoing reasons and others that may appear to the Court or may develop at any hearing on this motion, Enis Jevric respectfully requests his motion for compassionate release be granted.

Dated: July 15, 2025                          Respectfully submitted,

SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC

/s/ Christopher Macchiaroli
Christopher Macchiaroli (D.C. Bar No. 491825)
1775 I Street, NW, Suite 1150
Washington, DC 20006
Telephone: (202) 539-2444
Facsimile: (410) 547-2432
Email: cmacchiaroli@silvermanthompson.com

*Counsel for Defendant Enis Jevric*

---

about his care, safety, and/or compliance with release conditions. Sgt. Jevric also has many friends and family that are willing to drive him from his BOP facility to his home upon release.